## ST. LOUIS-SAN FRANCISCO RY. CO. v. HERMAN.

No. 12932—Opinion Filed Feb. 19, 1924.

Rehearing Denied April 1, 1924.

**Carriers—Action for Damages for Delay in Live Stock Shipment—Failure of Evidence.**

In an action against a railroad company for damages to a shipment of cattle by delay in transit which kept the cattle so long standing in the cars that they were in such condition when unloaded in the stockyards that they would not eat and drink sufficient to take a proper "fill" before being offered for sale on the market, where the plaintiff testified that he kept them from water 18 or 20 hours before shipment and fed them dry hay to make them dry and thirsty, and that his purpose was to keep them off water until they reached their destination, so that they would drink a large amount of water just before being offered on the market for sale, thereby giving them a proper "fill," and that by reason of the unnecessary delay of about 8 or 9 hours in the cars in transit they were kept off water so long that they would not eat and drink sufficient to take a proper fill, and no evidence was offered tending to show that they were of less value without the "fill" than they would have been with the fill, held, there was no evidence as to damages which would entitle the plaintiff to recover.

(Syllabus by Ray, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Oklahoma County; Geo. W. Clark, Judge.

Action by E. W. Herman against St. Louis-San Francisco Railway Company. Judgment for plaintiff, and defendant appeals. Reversed.

W. F. Evans, Stuart, Sharp & Cruce, and W. T. Stratton, for plaintiff in error.

Walter & Hilpirt, for defendant in error.

Opinion by RAY, C. April 3, 1920. E. W. Herman delivered to the St. Louis-San Francisco Railway Company, loaded in its cars at Cyril, 79 head of cattle and 117

hogs, being two carloads of hogs, for delivery to Vincent-Aldridge Commission Company at the National Stock Yards, Oklahoma City, and thereafter recovered judgment for $199 damages to the shipment, from which judgment the railway company appeals.

The grounds for recovery, as alleged in the bill of particulars, were, in substance, that the defendant carelessly, willfully, and negligently delayed the shipment in transit in its cars, pens, and yards, and at its stations, for more than 14 hours beyond the usual, ordinary, and reasonable time, and delivered them at the stockyards too late to give them the proper "fill" before sale that day, and because of the delay the stock did not get the proper fill; and that because of the delay and the long and unusual standing in the cars, they were greatly shrunken, gaunted in flesh, and weighed much less than they would have weighed if delivered in the proper time, and were greatly depreciated in physical appearance and salable value.

The hogs and cattle were loaded in the cars by the plaintiff between 11:30 a. m. and 1:00 p. m. and stood in the cars in the yard until 4:35 p. m., when they were picked up and delivered to Chickasha by local freight, and there put into a through train and delivered at the stockyards at Oklahoma City between 5 and 6 o'clock the following morning between 10 and 11 hours after loading, and about 13 hours in transit. The shipment was on Saturday to be delivered at the stockyards on Sunday morning for the Monday morning market.

Plaintiff's evidence showed that he lived 3 1-2 miles from Cyril and had been engaged in shipping cattle and hogs for 5 years; that in making this shipment he followed his usual custom of watering the cattle and hogs the night before shipment, and not letting them have any more water until they reached the market, and feeding the cattle all the dry hay they would eat, and feeding the hogs corn, so that they would be dry and thirsty and fill up on water just before the sale. In this instance they were permitted to have water Friday evening. Saturday morning the cattle were driven and the hogs hauled from his place to Cyril and put in the stock pens. The cattle were fed all the dry hay they would eat to make them thirsty, and the hogs fed corn for the same purpose, and they were not permitted to have any more water until they were unloaded in the stockyards at Oklahoma City. It is contended by the plaintiff that because of the long time the cattle were standing in the cars they were in such condition when they reached the

ckyards that they would not eat and drink sufficient water to properly fill up or take a proper fill" before the sale Monday morning. Plaintiff testified that the cattle weighed 40,100 pounds on his scales before leaving his place and only weighed 37,020 pounds at the market, or a loss of 3,080 pounds; that the hogs weighed 20,000 pounds on his scales and 19,280 pounds at the market, or loss of 720 pounds. On direct examination, in justification for "shrinking" stock for market and in explanation of his particular method of "shrinkage" he testified:

"Well, I generally keep the cattle off of water overnight at home, feed them dry hay, and that makes them thirsty and ship them in here (Oklahoma City) and they are thirsty and dried out. Of course water is what weighs most, and hay does not weigh much, and what water they drink makes up their weight."

On cross-examination:

"I keep the cattle eating hay. I don't give them no water understand, and I keep them eating dry hay in order to make them thirsty and dry so that they will drink water when they get up here. * * * Now, I handled these cattle just like I said, a while ago. I gave these cattle their drink through the day. If I was going to ship in the morning or tomorrow night, I put those cattle in the corral tonight, let them have water all today, let them run to the tank or pond and get water, then tonight, I would shut them up in the lot, give them hay, and then in the morning I would weigh those cattle right out of the lot, drive them into town, not let them have any water, get them into town, if I have to lay there until tomorrow evening, those cattle would be fed all day tomorrow. Then tomorrow I would load them around 9:30 (p. m.) that is usually the time of getting out of there and ship them in here, and next morning they take a good heavy fill."

In explaining why they did not properly "fill" after being unloaded in the stockyards at 6 o'clock Sunday morning and before the market opened at 9 o'clock Monday morning, the plaintiff testified:

"* * * You can hold cattle off of water so long they won't take the fill that they will if they get their fill at the ordinary time. * * * I have shipped a number of times, I have experimented along that line, I have shipped a number of times on Saturday and held over for Monday market, and I never can get as good a fill on my stock as I can by shipping them in the evening, and arrive in the pens and fill them in the morning, and sell the same morning I fill. * * * That is my experience with the stock. If the stock is held on the car and get sore and tired from standing up, they will come in the yard and lay down. They won't eat; they won't drink. * * *

"I think the rest they got Sunday standing out here on the paving in the stockyards, on the brick pavement, I think it tired the cattle, more than the fill they would take. They wouldn't take no fill, wouldn't eat. The cattle would lay down the minute they would get in the yard, I tried to get them up and make them go and eat and they wouldn't eat."

In answer to questions on cross-examination as to whether the buyers knew when cattle were filled with water, he testified:

"Now, that is his idea. If we can fill those cattle and get them by with a good fill, more than they can realize, that is our business. If he can figure that these cattle have got a heavy fill, he may cut in the price; that is true, he may cut in the price, but you have water weight enough to overcome what he cuts in the price. * * * No, he can't tell exactly how much water I put in this stuff. No, sir; he has no way of weighing them. * * * He knows if they look apparently gaunt and tired. Yes, he knows they have no fill."

No claim is made that a market day was missed or that the animals were roughly handled. The only contention is that by reason of the long hours on the road they would not fill up on water. The only authority cited in support of this contention is T. & P. Ry. Co. v. West Bros. et al., West Bros. et al. v. St. Louis, I. M. and S. Ry. Co. (Tex.) 207 S. W. 918. We think the opinion in that case does not sustain the plaintiff's contention, but, on the contrary, condemns it. In that case West Brothers had a verbal contract with the initial carrier in the shipment of a number of cars of cattle from Texas to East St. Louis, Ill., that they would be so handled that they would only be required to give them one feed and one watering on the road so that they would arrive at East St. Louis for the market on a particular day in time to take on a proper "fill." The cattle arrived one day late and were required to be fed and watered twice on the road. The case was first before the Court of Civil Appeals, 159 S. W. 142. That court held that the oral contract might be utilized for certain purposes pointed out in the opinion, but said:

"There is no allegation tending to show either of these matters, however; the only complaint seeming to be that the cattle were not transported fast enough to avoid a second stop for feeding and watering, which second feeding and watering prevented the cattle from carrying to their destination a thirst that would cause them to inflate themselves with water so as to increase their weight and consequent value. Whatever may have been the custom as to filling the cattle with water just before a sale, it is a fraud upon the rights of the buyers that cannot be tolerated as a basis for damages

in a court of justice. The railroad company cannot be condemned to pay damages because it acted in such a way, whether designedly or not, as to prevent a fraud upon the rights of others, and failure to carry out a contract to perpetrate such fraud will not be allowed to be made a basis for damages."

On rehearing the court said:

"There was no charge made in our former opinion of conscious fraud upon the part of appellees in entering into the oral contract with appellant as to the water 'fill' of the cattle. The evidence fails to show any attempt or desire upon the part of appellee to defraud any one, and the court merely declared that it would not enforce a contract which would have a tendency to perpetrate a fraud. Independent of any intention or desire to defraud any one the terms of the contract would in law amount to a fraud. If it be a custom to keep cattle from water or feed for a certain time, and then have them to 'fill' themselves just before a sale, it is a custom better kept in the breach than in the performance: and while it might be that, being done with the knowledge of the buyer, he would have no cause of complaint, yet a contract with a railroad company to assist in the watering process could not be enforced."

On error to the Supreme Court, 207 S. W. 918, it was said:

"The West Bros. assert that the Court of Civil Appeals erred in denying them the right to recover for the extra 'fill' pleaded by them.

"We do not understand the opinion of the Court of Civil Appeals to go to the extent which they assert. We gather from that opinion that it is simply holding against the proposition that plaintiffs can recover in this action the damages by reason of the failure of their cattle to take on the extra 'fill,' which is alleged to have resulted from a breach of the verbal contract.

"We do not understand that opinion to deny plaintiffs the benefits which may be claimed by reason of loss of 'fill.'

"The record shows that the shippers and the buyers understand the custom prevailing among cattlemen of feeding and watering cattle just before they are offered for sale this being commonly denominated in cowmen's parlance 'fill.' There is no fraud in this, since it is permissible and understood by the trade We surmise that the buyer takes this fill into consideration in fixing the price which he offers for the cattle. The want of 'fill' may detract from the appearance of the cattle and affect the market appearance of the cattle and affect the market price. It will also cause a loss in value by reason of the 'falling off' in weight.

"The shipper is entitled to the benefit of the 'fill,' as it may affect the value of his cattle. It is proper to plead and show anything which in reasonable contemplation of shipper, buyer, and carrier may affect the market value of the stock in determining whether there is loss or not."

On rehearing, 214 S. W. 808, the court said:

"* * * We do not think the language used by us in the original opinion is capable of being construed into a holding that plaintiffs could contract so as to recover because the cattle had been fed twice en route and thereby failed to take on 'extra fill.' Our holding the verbal contract void destroys such construction. However, if the shipment was delayed by the defendant company, and on account of such delay plaintiffs' cattle were damaged in appearance and lost in weight by reason of 'loss of fill' reasonably in contemplation, such 'loss of fill' is proper to be shown, not that plaintiff recovers for the 'loss of fill' as such, but their damages in market as affected by such loss."

We understand the opinion to mean that the railroad company cannot be held to respond in damages for loss of "fill" occasioned by delay in transit unless it be such loss of "fill" reasonably in contemplation and such as to damage in appearance and loss of weight to the extent that the market value is affected By "loss of fill reasonably in contemplation" we understand is meant that loss of fill occasioned by failure to water and feed in the usual and ordinary way after unloading and before sale to put the cattle in normal condition for sale as practiced by shippers generally and recognized in the market as legitimate. The Texas case is not an authority recognizing the validity of plaintiff's claim, and we know of but one other recorded case. Daniel Drew, in his book, tells us that when he was a drover delivering cattle in New York City he made substantial profits by salting his cattle at night and driving through the heat of the morning and watering them just before sale, but he had to look for a different butcher each time, and he also tells that from that practice originated the term "watered stock" which later came into general use in Wall Street when he and Gould and Fisk were promoting and operating railroad and steamboat lines. The Daniel Drew case is not exactly in point, for the plaintiff refrains from the use of salt for the reason that "salt scours them too much," but resorts to dry hay because it has reverse effect, and, therefore, produces more satisfactory results.

The plaintiff must be commended for his frankness, but the law does not aid him in his enterprise. If, as testified by him, the cattle and hogs were so long without water

that they would not eat and drink after being unloaded in the stockyards, the railroad company cannot be held liable for their enforced abstinence from water for 18 ot 20 hours before being taken up by the railroad company. A reasonable deduction from plaintiff's testimony is that the buyers take into consideration the "fill" or want of "fill" in fix'ng the price they offer, and no evidence was offered even tending to show that they were of less value without the fill than they would have been with it.

There was no evidence as to damages for which the plaintiff is entitled to recover.

The judgment should be reversed, with directions to vacate the judgment and proceed in conformity to this opinion.

By the Court: It is so ordered.